IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

PAUL COHEN, an individual, CLARK        :
ESPERANCE, an individual, GEORGE J.     :
FEBISH, an individual, and JAN GORDON, :
an individual                           :
                                        :
                    Plaintiffs,         :
                                        :
v.                                      :    C. A. No. 10-316-LPS/MPT
                                        :
FORMULA PLUS, INC., a Delaware          :
Corporation, and Does 1-10,             :
                                        :
                    Defendants.         :

## MEMORANDUM OPINION

Kelly A. Green, Esquire, Klehr, Harrison, Harvey, Branzburg, and Ellers, Wilmington, Delaware; Tedd S. Levine, Esquire, The Law Offices of Tedd S. Levine, Garden City, New York.
Counsel for Plaintiffs.

Kurt M. Heyman, Esquire, Dominick T. Gattuso, Esquire, Proctor Heyman, Wilmington, Delaware; Michael A. Corfield, Esquire, Corfield Law, Irvine, California.
Counsel for Defendant.

Dated: November 8, 2010
Wilmington, Delaware

**THYNGE, Magistrate Judge**

## INTRODUCTION

In this case, the court now considers defendants Formula Plus, Inc. and Does 1-10's ("Formula Plus") motion to dismiss pursuant to FED. R. CIV. P. 12(b)(1), or, in the alternative, its motion to stay the proceedings pending arbitration.[1]  The parties completed briefing on these issues on September 8, 2010.[2]  For the reasons stated below, the motions are denied.[3]

## BACKGROUND

On March 23, 2004, George Febish ("Febish") entered into a commission agreement with Formula Plus.[4]  The agreement was signed by Ronald Weber ("Weber"), President and CEO of Formula Plus.  Weber is also an attorney.[5]  Under the terms of the agreement, Febish would be paid a "15% commission of the total purchase price . . . for each gallon of the Formula Plus Fuel Treatment ("Treatment") sold to those clients secured by you or your assigns on behalf of the company."[6]  The duration of this agreement was 180 days in order to secure interest in the product in the country of Ghana.[7]

In April 2004, Paul Cohen ("Cohen") introduced Formula Plus to a "substantial oil

---

[1] D.I. 12.

[2] D.I. 20.

[3] The parties' consent to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73 was entered on August 25, 2010.  *See* D.I. 17.

[4] D.I. 14, Ex. 1.

[5] D.I. 18 at 2.

[6] D.I. 14, Ex. 1.

[7] *Id.*

2

refinery opportunity in the Republic of Ghana."[8]  Thereafter, Clark Esperance

("Esperance") and Cohen discussed using Formula Plus with the son of a regional

Ghanaian king and negotiated a deal to sell the Formula Plus fuel treatment.[9]  Jan

Gordon ("Gordon") and Febish assisted in finalizing the sale, and as a group, all four

plaintiffs invested considerable time and effort into securing the deal between Formula

Plus and Ghana.[10]

On July 20, 2004, Febish and Formula Plus signed a subsequent agreement that

officially extended the term of appointment for Febish and his assigns (undesignated in

the document) as the exclusive agent for Formula Plus in Ghana.  The agreement

contained the following provision:  "[i]t is understood by the parties that this letter

super[s]edes all previous agreements, written or oral, between the Company and the

Agent relating to Ghana."[11]  Additionally, the agreement contained an arbitration clause

providing, in part, "[a]ny dispute . . . shall be settled by final arbitration conducted in

English in accordance with the American Arbitration Rules."[12]  This agreement was

again signed by both Febish and Weber.

On October 1, 2005, an addendum to the commission agreement was executed

again only by Febish and Weber.  The first paragraph states, "[t]his Addendum to the

Commission Agreement ("Agreement") of March 23, 2004 (as subsequently amended)

between Mr. Ronald F. Weber, on behalf of Formula Plus and Mr. George Febish or his

---

[8] D.I. 11 at 3.
[9] *Id.* at 4.
[10] *Id.*
[11] D.I. 14, Ex. 2 at 1.
[12] D.I. 14, Ex. 2 at 4.

3

assigns shall become effective upon execution by the Parties." The addendum set forth the following commission distribution: 4.2% to BCP, Inc., 1.4% to George Febish, 1.4% to Jan Gordon, and 8.0% to Ghana In-Country Personnel.

Subsequently, on November 15, 2005, each plaintiff entered into a separate commission agreement with Formula Plus. Apparently, mistrust of Febish had developed regarding monetary distributions, and Cohen, Esperance, and Gordon requested separate commission agreements from Formula Plus to ensure their portion of the commission was fair and sent directly to them. The four individual documents are identical and begin with the following language:

> This Commission Agreement ("Agreement") is effective upon execution by Mr. Ronald F. Weber, on behalf of Formula Plus and [plaintiff] or his assigns and *shall supersede all previous Agreements*, either written or oral, between the parties as to any sales of the Formula Plus Fuel Treatment ("Treatment") made in those countries in Africa contemplated by this Agreement.[13]

The agreements note that the commission percentages changed so that each plaintiff was to receive 1% of the purchase price of each gallon of the Formula Plus fuel treatment.[14] Plaintiffs signed their respective commission agreements. Weber executed each of the agreements as well. Above the signature lines is a statement that reflects the agreement was executed in Scottsdale, AZ and the respective city and state of each plaintiff: Marlton, N.J. for Febish; North Salem, N.Y. for Cohen; Los Angeles, CA for Gordon; and Willingboro, N.J. for Esperance.[15]

Subsequently, quantities of the Formula Plus fuel treatment were shipped to

---

[13] D.I. 18, Ex. A at 1-4 (emphasis added).
[14] *Id.*
[15] *Id.*

4

Ghana.[16] In September 2009, Formula Plus, in writing, expressly repudiated all contractual obligations to plaintiffs under their individual commission agreements.[17]

## STANDARDS OF REVIEW

### Arbitration

When jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence.[18] Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially, that is, based on the legal sufficiency of the claim, or factually, based on the sufficiency of jurisdictional facts.[19] A motion to dismiss on the basis that the dispute must be arbitrated is a factual challenge.[20]

When there is a factual attack, the court is not "confine[d] to the allegations in the . . . complaint, but [may] consider affidavits, depositions and testimony to resolve factual issues bearing on jurisdiction."[21] Under that circumstance, "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims."[22]

Arbitration disputes are governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 *et seq.* Prior to compelling arbitration under the FAA, a court must first determine

---

[16] D.I. 11 at 4.

[17] *Id.*

[18] *See Carpet Group Int'l. v. Oriental Rug Importers Ass'n., Inc.*, 227 F.3d 62, 69 (3d Cir. 2000).

[19] 2 *Moore's Federal Practice* § 12.30[4] (3d ed. 1997).

[20] *Gonzalez v. Citigroup*, No. 09-017-SLR, 2009 WL 2340678, at *1 n.1 (D. Del. 2009).

[21] *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997); *see also Mortenson v. First Fed. Sav. & Loan Ass'n.*, 549 F.2d 884, 891-92 (3d Cir. 1977).

[22] *Carpet Group*, 227 F.3d at 69 (quoting *Mortenson*, 549 F.3d at 891).

whether the parties have agreed to arbitrate.[23]  That determination is made by applying

"ordinary state-law principles that govern the formation of contracts."[24]  Second, the

dispute at issue must come within the scope of the arbitration agreement.[25]  Pursuant to

the FAA and federal policy, there is a presumption in favor of arbitration "in determining

whether the particular dispute falls within a valid arbitration agreement's scope."[26]

## Choice of Law

This case involves parties from five states:  Delaware, Arizona, New Jersey, New

York, and California.  Accordingly, the court must conduct a survey of the law of each

state to determine which apply to this action.  The first issue for resolution is which state

law applies when a contract is silent on its face as to the choice of law.

In Delaware, when there is no reference to the choice of law in a contract, courts

apply the "most significant relationship" test articulated in the RESTATEMENT (SECOND)

OF CONFLICT OF LAWS to resolve conflict issues arising out of the interpretation and

validity of contracts.[27]  The "most significant relationship" test is defined in § 188 of the

Restatement:

(1) The rights and duties of the parties with respect to an issue in contract
are determined by the local law of the state which, with respect to that
issue, has the most significant relationship to the transaction and the
parties under the principles stated in § 6.

---

[23] *Century Indemnity Co. v. Certain Underwriters at Lloyd's*, No. 08-2924, 2009
WL 3297322, at *5 (3d Cir. 2009).

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *In re Kaiser Group Int'l., Inc.*, Bankr. No. 00-02263-MFW, 2010 WL 3271198,
at *5 (Bankr. D. Del. 2010); *see also Travelers Indem. Co. v. Lake,* 594 A.2d 38, 41
(Del. 1991).

(2) In the absence of an effective choice of law by the parties . . . the
contacts to be taken into account in applying the principles of § 6 to
determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of
business of the parties.

These contacts are to be evaluated according to their relative importance
with respect to the particular issue.

(3) If the place of negotiating the contract and the place of performance
are in the same state, the local law of this state will usually be applied,
except as otherwise provided in §§ 189-199 and 203.[28]

The principles stated in § 6 of the Restatement are as follows:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests
of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.[29]

Arizona takes an identical approach: "[i]n the absence of an explicit choice of

law by the parties, the contractual rights and duties of the parties are determined by the

local law of the state having the most significant relationship to the parties and the

transaction."[30]  New York follows the same course: "[t]he Second Restatement, in

addition to . . . the place of contracting, offers four other factors to be considered in

establishing this most significant relationship:  the places of negotiation and

---

[28] RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188(1-3) (1971).

[29] *Id.* § 6.

[30] *Cardon v. Cotton Lane Holdings, Inc.*, 841 P.2d 198, 202 (Ariz. 1992) (citing
RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188).

performance; the location of the subject matter; and the domicile or place of business of the contracting parties."[31] Additionally, New Jersey follows the Restatement's conflict-of-law standard in contract actions whereby "the 'most significant relationship' test . . . focuses upon that state which has the most meaningful connections with the transaction and the parties in issue . . . [and] [t]hese important contacts become relevant in the assessment of those basic considerations which determine ultimately the choice of law.[32]

California has a slightly different approach that does not invoke the Restatement's "most significant relationship test." Instead, California resolves the issue by statute. "Civil Code section 1646 determines the law governing contract interpretation notwithstanding the application of the governmental interest analysis to other choice-of-law issues."[33] The statute provides: "[a] contract is to be interpreted according to the law and usage of the place where it is to be performed; or, if it does not indicate a place of performance, according to the law and usage of the place where it is made."[34] Although California does not apply the Restatement, its statutory factors are similar.

**Parol Evidence**

In Delaware, "[i]f a contract is unambiguous, extrinsic evidence may not be used

---

[31] *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 642 N.E.2d 1065, 1068 (N.Y. 1994).

[32] *State Farm Mut. Auto. Ins. Co. v. Simmons' Estate*, 417 A.2d 488, 491 (N.J. 1980).

[33] *Frontier Oil Corp. v. RLI Ins. Co.*, 63 Cal. Rptr. 3d 816, 836 (Cal. Ct. App. 2007).

[34] Cal. Civ. Code § 1646 (West 2010).

to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity.[35] If the instrument is clear and unambiguous on its face, parol evidence may not be considered "to interpret it or search for the parties' intent . . . ."[36] The parol evidence rule provides that "[w]hen two parties have made a contract and have expressed it in a writing to which they have both assented as to the complete and accurate integration of that contract, evidence . . . of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."[37]

To ensure compliance with the parol evidence rule, the court first must determine whether the terms of the contract to be construed clearly state the parties' agreement.[38] However, a contract is not rendered ambiguous simply because the parties disagree as to the meaning of its terms.[39] "Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings."[40] Upon concluding that the contract clearly and unambiguously reflects the parties' intent, the court's interpretation of the contract must be confined to the "four corners" of the document.[41]

[35] *Eagle Industries, Inc. v. DeVilbiss Health Care Inc.*, 702 A.2d 1228, 1232 (Del. 1997).

[36] *Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343 (Del. Supr. 1983).

[37] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 556 (Del. Super. 2005) (quoting 26 CORBIN ON CONTRACTS § 573 (1960)).

[38] *Comrie v. Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003) (citing *In re Explorer Pipeline Co.,* 781 A.2d 705, 713 (Del. Ch. 2001)).

[39] *See Rhone-Poulenc Basic Chem. Co. v. American Motorists Ins. Co.,* 616 A.2d 1192, 1196 (Del. 1992) ("A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction.").

[40] *Id.*

[41] *See O'Brien v. Progressive Northern Ins. Co.,* 785 A.2d 281, 288-89 (Del.

9

California law states: "[t]he parol evidence rule generally prohibits the introduction of extrinsic evidence—oral or written—to vary or contradict the terms of an integrated written instrument."[42] According to this substantive rule of law, "when the parties intend a written agreement to be the final and complete expression of their understanding, that writing becomes the final contract between the parties, which may not be contradicted by even the most persuasive evidence of collateral agreements. Such evidence is legally irrelevant."[43]

New York and New Jersey follow a similar analysis of parol evidence. In New York, "[w]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms. Evidence outside the four corners of the document as to what was really intended but unstated . . . is generally inadmissible to add to or vary the writing."[44] It is well settled that "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face."[45] In New Jersey, "admission of evidence of extrinsic facts is not for the purpose of changing the writing . . . [such] evidence is . . . only for the purpose of interpreting the writing to aid in determining the meaning of what has been said, not for the purpose of modifying or enlarging or curtailing its terms."[46] "Extrinsic evidence of one party's alleged contractual intent is not

---

2001).
    [42] *EPA Real Estate Partnership v. Kang*, 115 Cal. Rptr. 2d 209, 211 (Cal. Ct. App. 1992).
    [43] *Id.*
    [44] *W.W.W. Assoc., Inc. v. Giancontieri*, 566 N.E.2d 639, 641 (N.Y. 1990).
    [45] *Id.*
    [46] *Conway v. 287 Corporate Center Associates*, 901 A.2d 341, 347 (N.J. 2006).

10

admissible to alter or contradict express and unambiguous terms of a written agreement."[47]

Arizona law differs slightly from the other four states as it generally looks to the contracting parties intentions when interpreting a contract.[48]  "The court must decide what evidence, other than the writing, is admissible in the interpretation process, bearing in mind that the parol evidence rule prohibits extrinsic evidence to vary or contradict, but not to interpret, the agreement."[49]  First, the court considers evidence to determine the extent of integration, illuminate the meaning of the contract language, or demonstrate the parties' intent.[50]  The second step involves "finalizing" the court's understanding of the contract, and here "the parol evidence rule applies and *precludes admission* of the extrinsic evidence that would vary or contradict the meaning of the written words."[51]

Most notably, Arizona lacks the prerequisite of ambiguity that the other four states share in common.  The Arizona Supreme Court states:  "[w]e are hesitant to endorse . . . the often repeated and usually over-simplified construct that ambiguity must exist before parol evidence is admissible."[52]  The proffered policy is that "the ambiguity determination distracts the court from its primary objective–to enforce the

---

[47] *Saul v. Midlantic Nat. Bank/South*, 572 A.2d 650, 658 (N.J. Super. Ct. App. Div. 1990).

[48] *See Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 682 P.2d 388, 397-98 (Ariz. 1984).

[49] *Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138 (Ariz. 1993).

[50] *Id.* at 1139 (citing 3 Arthur L. Corbin, CORBIN ON CONTRACTS § 542, at 100-01 (1992 Supp.)).

[51] *Id.*

[52] *Id.* at 1140.

11

contract as intended by the parties."[53] The rule in Arizona "is that the judge first considers the offered evidence and, if he or she finds that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties."[54]

## DISCUSSION

Formula Plus argues that this dispute is governed by the FAA because the parties entered into a valid arbitration agreement, embodied in a commission agreement, which specifically provides that "[a]ny dispute . . . shall be settled by final arbitration conducted in English in accordance with the American Arbitration Rules." Plaintiffs counter that the arbitration agreement does not operate because it is not embodied in the latest commission agreements signed by Weber and each plaintiff individually.

The FAA does not require arbitration unless the parties have contractually agreed to arbitrate. The court is convinced that in the present matter, the parties entered into valid separate commission agreements, but did not agree to arbitrate their claims due to the absence of an arbitration provision in the commission agreements signed on November 14, 2005.

The evidence shows that, unlike prior commission agreements, in the last commission agreement Formula Plus and plaintiffs were direct parties.[55] Further, each plaintiff was offered "a commission equal to 1% of the purchase price of each gallon of

---

[53] Id.

[54] Id.

[55] The previous commission agreements only named Febish and Formula Plus. At best, plaintiffs were referenced as "assigns."

12

the Formula Plus Fuel Treatment ("Treatment") sold by Formula Plus."[56]  Their

signatures at the end of the agreement confirm their acceptance.  Directly above the

signature line, the commission agreement reads:  "[t]he Parties do hereby agree to the

provisions contained in this Agreement."[57]  Both Weber and plaintiffs' respective

signatures appear on the same page of the newly drafted individual commission

agreements.  The necessary elements of offer, acceptance, and consideration are

therefore established for the creation of a valid contract between Formula Plus and

each plaintiff.

The court, having concluded that the parties entered into a valid contract (i.e.,

the individual commission agreements of November 14, 2005), must now decide

whether to allow extrinsic evidence to determine if the parties intended to arbitrate any

disputes as contained in the previous agreements and the addendum.  Plaintiffs

correctly note that the separate commission agreements do not contain any choice of

law provision.[58]  Formula Plus asserts that Arizona law applies, but that language does

not appear in the individual commission agreements.[59]  Neither party claims that the

laws of the Republic of Ghana should operate.  Furthermore, it is reasonable to infer

that the majority of the work necessary to secure the sale of the fuel treatment is

performed in the home state of each plaintiff.[60]  In the end, however, the result remains

---

[56] D.I. 18, Ex. A.

[57] *Id.*

[58] D.I. 18 at 3 (quoting the Declaration of Paul Cohen).

[59] D.I. 13 at 10.

[60] *See* D.I. 18 at 3.  The commission agreements were drafted and signed by
Weber in Arizona before being sent to each plaintiff in their respective state for their
consideration and acceptance.

the same regardless of which state law would apply to the consideration of parol
evidence related to the individual commission agreements.

Except for Arizona, the other jurisdictions strictly adhere to the parol evidence
rule that, absent ambiguity, extrinsic evidence is not considered in determining the
meaning of a written contract.[61] Here, the November 14 commission agreements are
not ambiguous. Therefore, extrinsic evidence cannot be used to construe their
meaning. The provision in the final commission agreements, "*shall supersede all
previous Agreements*," is not open for interpretation by parol evidence because it would
contradict, alter, expand, or distort the plain meaning of the written words. The
meaning of supersede, "[t]o annul, make void, or repeal by taking the place of,"[62] is
similarly not subject to interpretation. There is no arbitration provision in the individual
commission agreements. There is no incorporation of preceding agreements including
the July 20, 2004 agreement, which originally contained an arbitration provision. When
Formula Plus wanted to incorporate prior agreements, as considered in the first
paragraph of the Addendum of October 1, 2005, it did so by clear, precise language.[63]
Accordingly, the parties did not agree to arbitrate in the November 14 commission
agreements.

---

[61] *See Eagle Industries, Inc.*, 702 A.2d at 1232; *EPA Real Estate Partnership*,
115 Cal. Rptr. 2d at 211; *W.W.W. Assoc., Inc.*, 566 N.E.2d at 641; *Conway*, 901 A.2d at
347.

[62] BLACK'S LAW DICTIONARY 1479 (8th ed. 2004).

[63] "This Addendum to the Commission Agreement ("Agreement") of March 23,
2004 (as subsequently amended) between Mr. Ronald F. Weber, on behalf of Formula
Plus and Mr. George Febish or his assigns shall become effective upon execution by
the Parties." Additionally, the document is titled "COMMISSION AGREEMENT
(ADDENDUM)." *See* D.I. Ex. A at 12.

14

Applying Arizona's parol evidence rule results in the same conclusion. In that jurisdiction, the introduction of parol evidence is only allowed to determine the intent of the parties when there exists a dispute as to the meanings of words *in the contract*.[64] Similar to the other jurisdictions, parole evidence cannot be used to vary or contradict the clear meaning of the written terms. Here, there is a complete absence of any mention of arbitration. There is no language requiring court interpretation to find the parties' intent. There are no contract terms "reasonably susceptible" to the interpretation proposed by Formula Plus. Moreover, the language "shall supersede all previous Agreements" is not subject to nor requires interpretation with the aid of parol evidence. Formula Plus' argument would require the court to add terms that would modify "the meaning of the written words" which is inconsistent with Arizona law.[65] Finally, the separate November 14 agreements are contracts directly between Formula Plus and plaintiffs, rather than through Febish; provide specific and different commission rates for each plaintiff than previously allotted; and require the commission payment to flow directly from Formula Plus to each plaintiff. These modifications materially alter the previous agreements and serve as a clear indication that the parties entered into entirely new contracts without incorporation of any preceding agreements.

Because the parties did not contract to arbitrate, this matter is not subject to the FAA and this court has subject matter jurisdiction. In so finding, the court need not address Formula Plus' alternative motion to stay the proceedings pending arbitration.

---

[64] *Taylor*, 854 P.2d at 1138.
[65] *Id.* at 1139.

15

## CONCLUSION

Based upon the foregoing analysis, Formula Plus' motion to dismiss (D.I. 12) for

lack of subject matter jurisdiction pursuant to FED. R. CIV. P. 12(b)(1) is **DENIED**.

Formula Plus' alternative motion to stay proceedings pending arbitration is **DENIED** as

**MOOT**.